SHANON D. BRIDGES, ET AL v. UNITED SAVINGS ASSOCIATION

5-4732                                                  438 S.W. 2d 303

Opinion Delivered February 24, 1969

[Rehearing denied April 7, 1969.]

---

*Bethell, Stocks, Callaway & King* for appellant.

*Bill B. Wiggins* for cross-appellant.

*Warner, Warner, Ragon & Smith* for appellee.

J. FRED JONES, Justice.   This is an appeal by Shanon D. Bridges and a cross-appeal by Sam Sexton, Jr. from a decree of the Sebastian County Chancery Court in which a joint and several deficiency judgment was awarded in favor of United Savings Association in a mortgage foreclosure against Bridges and Sexton. Bridges satisfied the judgment and was awarded judgment over against Sexton on a cross-complaint.   The facts of record appear as follows:

On October 1, 1964, Bridges and a Mr. Wilson, together with their wives, borrowed $12,600.00 from United Savings Association of Fort Smith.   The loan was evidenced by a promissory note bearing interest at six per cent and payable in equal monthly installments of $81.19 each.   The note was secured by a mortgage on a new house and lot with an appraised value of $14,000.00.   Bridges and Wilson placed $1,400.00 of the amount borrowed into savings accounts with United and pledged these accounts to United as collateral security for the loan until such time as the principal loan balance should be reduced to $10,500.00.   This collateral secur

ity enabled Bridges and Wilson to borrow 90% of the appraised value of the house and lot rather than the customary 80% of appraised value.

On December 25, 1964, Sam Sexton, Jr. signed an offer to purchase the property for a purchase price of $12,900.00; $300.00 to be paid in cash and the loan to be assumed for the balance of $12,600.00. On January 8, 1965, Sam Sexton, Jr. did purchase the property from Bridges and Wilson. He paid $300.00 in cash and took title by warranty deed containing the following provisions:

"This conveyance made subject to a Mortgage in favor of United Savings Association of Fort Smith, Arkansas as recorded in Record Book 83, Page 519, filed October 9, 1964, for an original sum of $12,600.00, which there is an unpaid balance of $12,563.53, which the grantee herein assumes and agrees to pay."

Also on January 8, 1965, Sexton signed a separate "assumption of indebtedness" form, agreeing to make the payments on the mortgage indebtedness to United. After a few months Sexton defaulted in the payments to United resulting in the foreclosure action against Bridges, Wilson and Sexton. Bridges cross-complained seeking judgment over against Sexton for any judgment which United might recover against him and Sexton cross-complained against Bridges alleging that the sale to him was induced by fraud and that the collateral pledge should be applied first to any deficiency.

Wilson assigned his interest in the savings accounts to Bridges and the chancellor rendered a decree of foreclosure in favor of United for the full amount of the indebtedness and decreed that the real property be first sold and the proceeds applied on payment of the mortgage indebtedness; that the savings accounts pledged as security be next applied on the mortgage indebtedness

with joint and several judgment against Bridges and Sexton for any deficiency. The chancellor also decreed judgment over in favor of Bridges against Sexton for any amount Bridges should be required to pay in excess of the proceeds from the sale of the real property and after application of the savings accounts under the collateral pledge.

Bridges purchased the property at foreclosure sale for $11,000.00 and after crediting this amount, together with the pledged savings accounts, to the mortgage indebtedness, attorney's fee and court costs, a deficiency judgment was decreed against Bridges and Sexton in the amount of $2,078.41. The final decree for deficiency judgment then recites:

> "It further appearing to the court that the defendants, Shanon D. Bridges and Helen L. Bridges, have paid in full the above set out deficiency amount of $2,078.41 and are entitled to a judgment over against the defendant, Sam Sexton, Jr., for said amount, all in accordance with the foreclosure decree heretofore filed herein.
>
> \*   \*   \*
>
> IT IS FURTHER CONSIDERED, ORDERED, ADJUDGED AND DECREED that defendants, Shanon D. Bridges and Helen L. Bridges, do have and recover of and from the defendant, Sam Sexton, Jr., the sum of $2,078.41, with interest thereon at the rate of 6% per annum from December 27, 1967."

On direct appeal Bridges relies on the following points for reversal:

> "The chancellor erred as a matter of law in failing to grant Shanon D. Bridges, et ux, judgment against Sam Sexton, Jr., for the amount of the Bridges savings deposits utilized to satisfy the obligation assumed by Mr. Sexton.

The findings of fact of the chancellor are sustained by the overwhelming weight of the evidence.''

On cross-appeal Sexton relies on the following points:

''The device employed by Bridges and United Savings to accomplish the sale of the property constituted 'constructive fraud.'

The remedy in a fraud action of this type is to off-set damages against a claim for purchase price.''

We are forced to the conclusion that the appellant is correct in his contention. There were actually two separate transactions involved in this case. The first transaction was between the Bridges and the Wilsons on one side and the United Savings on the other. The second transaction was between the Bridges and the Wilsons on one side and Sexton on the other. In the first transaction the Bridges and Wilsons gave a mortgage on their real property to secure the payment of a loan made to them by United. In addition to the mortgage on their real estate, they pledged their savings accounts to United as additional security for the loan.

In the second transaction Sexton purchased the mortgaged property from the Bridges and the Wilsons for the sum of $12,900.00. He paid $300.00 in cash and agreed to pay the balance of $12,600.00 by assumption of the mortgage indebtedness, payable in monthly installments of $81.19 each. Sexton only purchased the real property from the Bridges and the Wilsons. He did not purchase, nor does he claim any interest in, the savings accounts which the Bridges and the Wilsons pledged as additional security for their loan. Sexton gave no collateral security when he purchased the property, but only paid $300.00 cash and purchased the property subject to the real estate mortgage indebtedness of

$12,600.00 which he agreed to pay. Assuming that the Bridges and the Wilsons had mortgaged their automobiles and furniture and their children had pledged their separate savings accounts as collateral security for their loan, such additional mortgages and pledges would not secure Sexton against a deficiency judgment on his own obligation under his separate contract, especially in the absence of fraud in its inducement.

We now come to Sexton's cross-appeal. We are of the opinion that the chancellor's finding, that the sale of the property to Sexton was not induced by fraud, is not against the preponderance of the evidence. It was candidly admitted by Bridges and United that the savings accounts in the amount of $1,400.00, pledged as collateral security by the Bridges and the Wilsons, came out of the $12,600.00 they borrowed from United and that United never did part with the possession of $1,400.00 of this loan at all. The question naturally arises as to whether the Bridges and the Wilsons actually borrowed $12,600.00 for which the note and mortgage were given, or whether the loan was actually for $12,600.00 less the $1,400.00 retained by United and placed in savings accounts in the name of Bridges and Wilson as additional security, but which remained in the possession and under the control of United at all times. Bridges and United contend that this procedure was followed for the benefit of a prospective purchaser of the mortgaged property, as well as for the benefit of the owner and original borrower. They contend that this procedure would enable the owner to sell the property with practically no down payment and with a built-in loan already financed. Sexton argues, with convincing logic, that this procedure is a built-in device which enables the original mortgagor owner to sell property to an unsuspecting purchaser for its full market value, while leaving the impression with the purchaser that he is purchasing the property at a distress sale for a mere pittance of its actual value, for only the balance due on the original purchase price, and for much less than was originally paid for the property.

Assuming that either, or both, arguments are correct, the question remains as to whether fraud was practiced on Sexton in this case. The question of usury is not raised in this case nor does Sexton seek cancellation of his contract because of fraud. The question is whether Sexton is somehow entitled to the benefit of Bridges' collateral security because of constructive or legal fraud perpetrated on Sexton. In *Arkansas Valley Compress & Warehouse Co.* v. *Morgan,* 217 Ark. 161, 229 S.W. 2d 133, we said:

"... [C]onstructive fraud ... has been stated to consist of certain elements. In *Levinson* v. *Treadway,* 190 Ark. 201, 78 S.W. 2d 59, Mr. Justice Mehaffy said:

'Persons, in order to be guilty of legal or constructive fraud, or, as it is sometimes called, fraud at law, do not necessarily have to be guilty of moral wrong, but a constructive fraud is a breach of either legal or equitable duty which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or injure public interests. Neither actual dishonesty of purpose nor intent to deceive, is an essential element of constructive fraud. 26 C.J. 1016 and cases cited.'

Bouvier's Law Dictionary says: 'Legal or constructive fraud includes such contracts or acts as, though not originating in any actual evil design or contrivance to perpetrate a fraud, yet by their tendency to deceive or mislead others, or to violate private or public confidence, are prohibited by law.'

In *Hildebrand* v. *Graves,* 169 Ark. 210, 275 S.W. 524, Mr. Justice Hart pointed out that in determining the question of fraud, all the surrounding circumstances are to be considered."

In 37 C.J.S., Fraud, §§ 15 and 16, p. 242, is found the following:

"The concealment of a material fact may be equivalent to a false representation and be sufficient upon which to predicate a charge of fraud; (citing *National Life & Accident Ins. Co.* v. *Hitt*, 194 Ark. 691, 109 S.W. 2d 426) however, mere silence is not representation and in the absence of a duty to speak ... silence as to a material fact does not of itself constitute fraud, although one who, instead of merely remaining silent, misrepresents or takes steps to conceal material facts, or who says or does something to avert inquiry, is guilty of fraudulent concealment ...

Where the parties deal at arm's length, there is no duty of disclosure where the facts are equally within the means of knowledge of both parties. If a fact is peculiarly within the knowledge of one party and of such a nature that the other party is justified in assuming its nonexistence, there is a duty of disclosure."

In *National Life & Accident Ins. Co.* v. *Hitt*, 194 Ark. 691, 109 S.W. 2d 426, is found the following:

"As was said in *Sanders* v. *Berry*, 139 Ark. 447, 214 S.W. 58, 'The law requires good faith in every business transaction, and does not allow one party to intentionally deceive another by making false representations or by concealment.' In *Lone Rock Bank* v. *Pipkin*, 169 Ark. 491, 276 S.W. 588, we said: 'If the means of information as to the matters represented is equally accessible to both parties, they will be presumed to have informed themselves; and, if they have not done so, they must abide the consequences of their own carelessness."

In *Lane* v. *Rachel*, 239 Ark. 400, 389 S.W. 2d 621, is found the following:

"It is well settled that representations are construed to be fraudulent when made by one who either knows the assurances to be false or else not knowing the verity asserts them to be true. *Fausett & Co.* v. *Bullard,* 217 Ark. 176, 229 S.W. 2d 490; *Maurice* v. *Chaffin,* 219 Ark. 273, 241 S.W. 2d 257. In C.J.S., Fraud, § 2, p. 211, constructive fraud is succinctly defined as 'breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others * * * *Neither actual dishonesty of purpose nor intent to deceive* is an essential element of constructive fraud.' "

Fraud is never presumed but must be affirmatively proven by the one who alleges it and by testimony which is clear and convincing. *Green* v. *Bush,* 203 Ark. 883, 159 S.W. 2d 458; *Ellis* v. *Ellis,* 220 Ark. 636, 246 S.W. 2d 302; *First National Bank* v. *Peoples National Bank,* 97 Ark. 15, 132 S.W. 1008; *Sledge and Norfleet Co.* v. *Mann,* 193 Ark. 884, 103 S.W. 2d 630.

The chancellor found that the circumstances surrounding the loan transactions in this case did not amount to constructive or legal fraud. We cannot say that his findings are against the preponderance of the evidence. There is nothing in the record before us that would indicate that the property was over appraised at $14,000.00 when the original loan was made, and there is no evidence that anyone even suggested to Sexton that the property was worth more than that amount or more than the amount he agreed to pay for it. There is no contention here that the property was over appraised; the contention of Sexton is that it was over financed. The property was financed at 90% of its appraised value rather than 80% and this could have been to Sexton's advantage as well as to his detriment.

Sexton was chairman of the board of a loan association, and was generally familiar with loan transac-

tions in the Fort Smith area. He knew from his personal knowledge and experience that the standard real estate loan did not exceed 80% of the appraised value of the property. The evidence clearly suggests that Sexton thought he was purchasing at least a 20% of $1,400.00 equity value in a new house and lot for a cash payment of $300.00, when as a matter of fact he only purchased a 10% or $700.00 equity value for $300.00. The record is clear that Sexton acted on his own knowledge and experience, rather than on representations, statements or inducements made by United or Bridges, or their agent.

The decree of the chancellor is reversed and this cause is remanded for the entry of a decree in favor of Bridges against Sexton for the full balance due on Sexton's obligation after crediting the amount received for the property at the foreclosure sale.

Reversed and remanded.